## WESTERN UNION TELEGRAPH COMPANY *v.* KRUEGER.

[No. 5,159.   Filed April 19, 1905.   Rehearing denied June 28,
1905.   Transfer denied October 25, 1905.]

1. TRESPASS.—*Title.*—*Deeds.*—*Possession.*—Where plaintiff in an
action for trespass proves possession under a warranty deed,
executed in 1900, from a grantor in possession, which grantor
derived title through a sheriff's deed executed in 1893, he has
established a *prima facie* title in fee simple.   p. 353.

2. DEEDS.—*Lands Bordering Highways.*—*Title to Highway.*—A
deed conveying land bordering on a street or highway, in the
absence of express limitations, conveys the fee to the middle of
such street or highway, even though the description in such
deed is by metes and bounds.   p. 353.

3. STATUTES.—*"Michigan Road."*—*Commissioner's Deed.*—*Title.*
—Under the act of 1832 (Acts 1832, p. 122), providing that the
commissioner of the "Michigan Road" lands should have·power
to sell in half-quarter sections "all the lands included in the
sections through which the road passes from Logansport to
Lake Michigan. * * * Provided, * * * if he consider
it for the interest of the State, to sell the part lying on one side
of the road in one parcel, and attach and sell with the half-
quarter that which lies on the opposite side of said road in the

same section, the other part of said half-quarter, so that every part of land sold may lie on said road," such commissioner had discretionary power to sell the entire half-quarter section "divided by the road running through the same." p. 362.

4. EVIDENCE.—*Records of Michigan Road Lands.—Statutes.*— Under §470 Burns 1901, §463 R. S. 1881, all of the records, or copies thereof duly certified by their proper keeper, and, by virtue of §7651 Burns 1901, §5628 R. S. 1881, copies certified by the Auditor of State, of the Michigan Road Lands are admissible in evidence and are *prima facie* evidence of the truth of their contents. p. 364.

5. SAME.—*Sections.—Judicial Notice.*—Courts take judicial notice of the location of the different sections in a congressional township. p. 365.

6. SAME. — *Geographical Locations.* — *Judicial Notice.* — Courts take judicial notice that sections thirty-one and twenty-eight in township thirty-eight north, range four west, and also the city of Michigan City are on the southeastern portion of Lake Michigan and northward from a ten-mile line running eastward from the southern extremity of Lake Michigan. p. 365.

7. TREATIES.—*Contracts.—Cessions.*—Where the United States received from the Pottawatomie Indians a cession of land extending from Logansport to Lake Michigan for the purpose of establishing a public highway from such lake through Indianapolis to the Ohio river, such tribe and their grantees were bound to yield up the necessary land from Logansport to the lake, and the United States and her grantees were compelled to furnish such land from Logansport to such river. p. 366.

8. HIGHWAYS.—*Soil.—Ownership.—Civil Law.*—By the civil law the public owns the soil in a public highway. p. 369.

9. SAME.—*Soil.—Ownership.—Common Law.*—By the common law where the state conveys lands abutting on a public highway, the grantee owns the fee to the middle thereof. p. 370.

10. SAME.—*"Michigan Road."—Ownership of Fee.*—The adjoining proprietors of the "Michigan Road" are the owners respectively of the fee to the middle of such road. p. 371.

From Laporte Superior Court; *Harry B. Tuthill,* Judge.

Action by Martin T. Krueger against the Western Union Telegraph Company. From a judgment on a verdict for plaintiff for $500, defendant appeals. *Affirmed.*

*Chambers, Pickens, Moores & Davidson* and *George H. Fearons,* for appellant.

*C. R. & J. B. Collins,* for appellee.

BLACK, J.—The appellee, alleging that he was the owner and in possession of certain real estate in Laporte county, adjoining and passing in front of which was a public highway, of so much of which as was adjacent to said real estate, to the middle of the highway, he was the owner in fee, sought damages from the appellant for injury, by cutting, to certain trees owned by him growing on that part of the highway so owned by him. The appellant answered by general denial and by a second paragraph, wherein it alleged that it was a corporation engaged in the business of transmitting for hire messages by telegraph throughout the United States and Canada, and had accepted the benefits and restrictions of the act of congress of July 24, 1866, under which it had the right to use the highways in all portions of the United States as post-roads and for the purpose of erecting its poles and lines of wire for the transmission of messages; that in the exercise of such right it constructed a line of wire supported by poles along said highway and adjoining the property of the appellee; and that any and all cutting and trimming of the trees along the highway, done by the appellant, were necessary to the proper construction and maintenance of the line, and were done without malice, and for the sole purpose of properly constructing, maintaining and protecting the line, and under and by virtue of the rights secured to the appellant by said act of congress. To this second paragraph of answer the appellee replied by general denial and by a special paragraph alleging that the appellant cut the trees a specified number of feet more than was reasonably required or necessary for the construction and proper maintenance of the line, etc.

The cause has been in this court before (*Western Union Tel. Co.* v. *Krueger* [1902], 30 Ind. App. 28), when a

judgment against the appellant was reversed because of insufficiency of the complaint. Upon the return of the cause to the court below the complaint was amended, and no objection to it is now pointed out on behalf of the appellant. The matters now presented relate to the evidence and instructions, and pertain to the single question whether the appellee, owner of the real estate abutting upon the highway, was also the owner of the land whereon the trees grew. The appellee proved that at the time of the injury to the trees he was in possession of the lots in question, which adjoined the highway, a street of Michigan City extending northwestward and southeastward, the lots abutting upon the north line thereof, the appellee holding under a conveyance by warranty deed from Charles O. Low, dated May 12, 1900, the real estate being designated as situated in Laporte county, Indiana, and described as follows: Lot eleven in Cheeney's subdivision of parts of sections twenty-eight and thirty-three, township thirty-eight north, range four west, containing eleven and thirty-seven hundreths acres; also a strip of land 173 feet wide off the east end of lot ten in Cheeney's subdivision of said sections twenty-eight and thirty-three, township thirty-eight north, range four west, containing four and four-hundredths acres.

There was also introduced in evidence on behalf of the appellee a sheriff's deed of conveyance dated March 6, 1893, under a judgment against Julia A. McCartney and William B. McCartney, and purporting to convey to said Low their interests in real estate described as in the deed of conveyance of Low to the appellee; and there was proof of Low's possession under the sheriff's deed at the time of his conveyance to the appellee. There was introduced for the appellee a plat, recorded May 13, 1873, of Cheeney's subdivision of parts of said two sections, showing the north line thereof as being the line dividing the southeast quarter of section twenty-eight, township thirty-eight north,

range four west, and the eastern line of the subdivision and of lot eleven thereof being the eastern line of section twenty-eight, and showing lots ten and eleven, with other lots, extending from said north line to the center of the Michigan Road, the center line of the road being the southern line of lots as indicated on the following plat:

PLAT OF

CHENEYS SUBDIVISION

Recorded May 13" 1873

Thus it appears that the appellee sufficiently proved his title to the lots abutting on the highway. A warranty deed of conveyance of real estate from one in possession 1. of the land, the conveyance of which is thereby purported, gives the grantee *prima facie* a good title. *Souders* v. *Jeffries* (1884), 98 Ind. 31. This is a very familiar rule, and the sufficiency of the evidence of the appellee's title to the lots is not disputed.

It is also a familiar principle of the common law that the conveyance of lots bounded on a public way conveys to the grantee the fee to the center of the way, unless 2. the terms or circumstances of the grant indicate a limitation of its extent to the exterior lines of the highway. *Banks* v. *Ogden* (1864), 2 Wall. 57, 17 L. Ed. 818; *Falls* v. *Reis* (1873), 74 Pa. St. 439; *White* v. *Godfrey* (1867), 97 Mass. 472; *Terre Haute, etc., R. Co.* v. *Scott* (1881), 74 Ind. 29; *City of Indianapolis* v. *Kingsbury* (1885), 101 Ind. 200, 51 Am. Rep. 749; *Kincaid* v. *Indianapolis Nat. Gas Co.* (1890), 124 Ind. 577, 8 L. R. A. 602, 19 Am. St. 113.

There was no attempt on the part of the appellant or of the appellee by evidence to trace the title back to its original source. The appellant introduced a deed of conveyance from Herman Lawson to John E. Cheeney, dated September 14, 1847, and intermediate conveyances showing the transmission of the title to the lots here in question to William B. McCartney, the descriptions in these intermediate conveyances corresponding with that in the conveyance to the appellee. In the deed from Lawson to Cheeney the land thereby conveyed was described as being part of section twenty-eight, township thirty-eight, range four west, "and bounded as follows: Beginning on the Michigan Road two four-pole chains from the southeast corner on the east line of said section, thence running north eighteen chains and twenty-eight links, thence west thirty-

two chains, thence south eight chains and forty links to the Michigan Road, thence easterly along said road to the place of beginning, containing forty-three acres, more or less." There was evidence from which the jury might have found that the point of beginning in this description was on the highway, and south of the center line thereof.

A deed conveying land described therein by metes and bounds running to and along the road carries the fee *prima facie* to the center of the highway. Elliott, Roads and Sts. (2d ed.), 722; *Montgomery* v. *Hines* (1893), 134 Ind. 221, 225. This must be true with respect to the deed of conveyance to Cheeney, unless a contrary decision is required by the lines of the boundary, tracing from the beginning point specially indicated. The words "to and along the highway to the place of beginning," "if not controlled by the starting point, would, by well-settled construction, carry the boundary to the center." *Kings County Fire Ins. Co.* v. *Stevens* (1882), 87 N. Y. 287, 41 Am. Rep. 361. In that case, the land was described as beginning at a point on the south side of the highway. Here it is described as beginning at a point on the highway which is sufficiently shown to be in the highway south of the center line thereof, though the plat of that grantee's subdivision showed the lots on the north side of the highway, including those here in question, as extending to the center, and therefore indicated that he claimed title to the center and no further; and the appellee holding under that grantee, who platted the land, claims to the center. We think there is nothing in the evidence thus far mentioned which necessarily overcomes the presumption that the appellee was the owner in fee simple to the center line of the highway. The introduction of the deed of conveyance to Cheeney, without tracing the title further back, seems to indicate an intention of the appellant at the trial to place some reliance upon the description therein; but the stress of the contention here relates to the question whether it should be considered

that the fee was not in the appellee because the highway was, it is claimed, the "Michigan Road."

A treaty was made between certain commissioners on the part of the United States and the chiefs and warriors of the Pottawatomie tribe of Indians, near the mouth of the Mississinewa, upon the Wabash, October 16, 1826, which was ratified February 7, 1827, by the terms of the first article of which that tribe ceded to the United States "their right to all the land within the following limits: Beginning on the Tippecanoe river, where the northern boundary of the tract ceded by the Pottawatomies to the United States by the treaty of St. Mary's in the year of our Lord 1818, intersects the same; thence, in a direct line, to a point on Eel river, half way between the mouth of said river and Pierish's village; thence up Eel river to Seek's village near the head thereof; thence, in a direct line, to the mouth of a creek emptying into the St. Joseph of the Miami, near Metea's village; thence up the St. Joseph to the boundary line between the states of Indiana and Ohio; thence south to the Miami; thence up the same to the reservation at Ft. Wayne, thence, with the lines of said reservation, to the boundary established by the treaty with the Miamis in 1818; thence, with said line, to the Wabash river; thence, with the same river, to the mouth of the Tippecanoe river; thence, with the Tippecanoe river, to the place of beginning. And said tribe also cede to the United States all their right to land within the following limits: Beginning at a point upon Lake Michigan ten miles due north of the southern extreme thereof; running thence, due east, to the land ceded by the Indians to the United States by the treaty of Chicago; thence south with the boundary thereof, ten miles; thence west to the southern extreme of Lake Michigan; thence, with the shore thereof, to the place of beginning.

"Article Two. As an evidence of the attachment which the Pottawatomie tribe feels towards the American people,

and particularly to the soil of Indiana, and with a view to demonstrate their liberality and benefit themselves by creating facilities for traveling and increasing the value of their remaining country, said tribe do hereby cede to the United States, a strip of land, commencing at Lake Michigan, and running thence to the Wabash river, 100 feet wide, for a road, and also, one section of good land contiguous to said road, for each mile of the same, and also for each mile of a road from the termination thereof, through Indianapolis to the Ohio river, for the purpose of making a road aforesaid from Lake Michigan, by way of Indianapolis, to some convenient point on the Ohio river. *And the General Assembly of the State of Indiana shall have a right to locate said road, and to apply said sections, or the proceeds thereof, to the making of the same, or any part thereof; and said grant shall be at their sole disposal."*

The senate of the United States, in ratifying this treaty, excepted the words in article two in italics. Proclamation of the treaty was made February 7, 1827. See Senate Doc. (vol. 35) No. 452, Indian Affairs, Laws and Treaties, vol. 2, p. 195; 7 Stat. at Large (Indian Treaties), 295.

By an act of congress approved March 2, 1827 (4 Stat. at Large, p. 234), it was provided: "That the General Assembly of the State of Indiana shall be, and the same are hereby, authorized to locate and make a road from Lake Michigan, by way of Indianapolis, to some convenient point on the Ohio river, agreeably to the second article of" the foregoing treaty; "and said General Assembly are hereby authorized to apply the strip of land and the sections of land, by said articles ceded to the United States, or the proceeds thereof, to the making of the same; and said grant shall be at their sole disposal."

By an act of the General Assembly of this State approved January 24, 1828 (Acts 1828, p. 87), John McDonald, Chester Elliott and John I. Neely were appointed commissioners to survey and mark a road from Lake Michigan to

Indianapolis, agreeably to the above-mentioned treaty and act of congress. It was provided that these commissioners should proceed to examine all the bays, inlets and estuaries of rivers on that part of Lake Michigan lying within the State of Indiana, in order to ascertain where the best harbor could be had; and, if no harbor could be found on that part of the shore of the lake, the commissioners were required to select such point as they should deem most eligible for the construction of an artificial harbor and suitable for a commercial town; and from the harbor so selected or the site so found they were required to proceed to survey and mark a road, by the most eligible route, to Indianapolis. It was provided that the commissioners should cause to be made an accurate survey of said road, stating its courses and distances, etc., and it was made their duty to deposit in the office of the Secretary of State a plat of the road, together with their notes, which report, it was provided, should be signed by the commissioners, and it was made the duty of the Secretary of State to lay the same before the General Assembly at its next session. The Governor was requested to correspond with the Secretary of War, for the purpose of ascertaining how and in what manner the State of Indiana should receive or take possession of the land granted by the treaty for the location and construction of the road, and the Governor, upon receipt of satisfactory information on that subject, was required to notify the commissioners and appoint a time for them to meet and commence the discharge of their duties.

There was introduced in evidence on behalf of the appellant what purported to be notes of the survey of the road from Lake Michigan to Indianapolis by the south bend of the St. Joseph river and Eel river. These notes indicated courses and distances for five miles, and were certified by the Auditor of State to be a full, true and complete copy of the field notes of the first five miles, beginning at Lake Michigan, of the survey of the Michigan Road

made by John I. Neely, Chester Elliott and John McDonald, commissioners, as the same appear from the original field notes on file in the office of the Auditor of State, the certificate being dated May 6, 1903. There is nothing in this evidence showing when the original notes were made or the date of the filing thereof, nor do they, or any other evidence introduced, indicate at what place on Lake Michigan was the point of beginning.

By an act of the General Assembly of January 13, 1830 (Acts 1830, p. 111), it was enacted that the road surveyed and marked by John I. Neely, Chester Elliott and John McDonald from Lake Michigan to Indianapolis, in pursuance of said act of January 24, 1828, *supra,* "as laid down in the field notes of the second survey and route, deposited in the office of the Secretary of State be, and the same is hereby established the road which the State of Indiana is authorized to locate and make, by the second article of" the above-mentioned treaty, "and also further authorized, by an act of congress of the United States, of the 2d of March, 1827; and said road be and the same is hereby continued, from said town of Indianapolis, along, in and upon the state road, through the town of Greensburgh, to the town of Madison, on the Ohio river, in the county of Jefferson."

Samuel Hanna, William Polke and Abraham M'Lelland were appointed "commissioners on said road" and were directed to meet at Madison, and to proceed to examine so much of said road as lay between Madison and Greensburgh; and it was provided that if they should think that the road or any part of it could advantageously be changed, they should employ a surveyor, etc., and survey, measure, and make the changes, etc.

The Governor was again requested to correspond with "the proper authorities of the general government, and ascertain" when and how "the lands donated by the treaty and act of congress aforesaid, to the State of Indiana, to open

said road, are to be surveyed," etc. It was provided that if the general government undertook the survey the Governor should notify said commissioners when to proceed to select the lands, and if the general government should refuse to survey the lands, the Governor should notify said commissioners to select the lands and survey "into sections, in manner and form that lands of the United States are surveyed and laid off, or as nearly so as practicable, and number the sections in numerical order, one, two, three, four and so on, through the whole number of sections." The services of the commissioners and the persons employed in the surveying were to be paid for out of the state treasury, and the commissioners were to keep a complete and correct record, and make complete maps, plats and field notes of their surveys, and file the same in the office of the Secretary of State on or before the first Monday of December, 1830. It was provided that all moneys expended in surveying, marking and locating the road from Lake Michigan to Indianapolis and from thence to the Ohio river, and in surveying and selecting said lands, paid out of the state treasury, should be refunded out of the first moneys from the sale of the lands.

The commissioners were authorized and required, previously to making an absolute location of that part of the road lying between Madison and Greensburgh, "to take releases of the various individuals, through whose land said road may run, of all damages which any such individual or individuals may sustain, in consequence of said road's running through his, her or their land; and shall also procure their assent, together with the assent of all individual land holders, contiguous to said road, to permit the State to take, carry away and use any stone, timber and gravel, or any necessary materials, which may be found upon their lands, to any reasonable extent, for the construction of said road." Acts 1830, p. 111, §8.

An act of January 29, 1830 (Acts 1830, p. 114), provided that so much of the Michigan Road as lay between the Wabash river and the Ohio river at Madison, should be cut and opened 100 feet wide between the 1st day of August, 1830, and the 30th day of November, 1831, the manner of doing the work being prescribed; and Noah Noble was appointed "a contract commissioner," to carry the statute into effect, the contractors to whom the work should be let to receive certificates payable out of the proceeds of the Michigan Road lands, and the services of the commissioner also to be paid for out of such proceeds.

By an act of February 4, 1831 (Acts 1831, p. 114), the board of commissioners, consisting of Hanna, Polke and M'Lelland, created by the statute of January 13, 1830, was abolished, its accomplished official acts being ratified; and William Polke was appointed sole commissioner, and he was required to complete the selecting, surveying, marking and numbering of the lands mentioned in said act of 1830, and to cause five complete plats, maps and descriptions of all said lands, showing the numbers, townships, ranges, watercourses and other necessary description, including as well the lands already selected and surveyed as those thereafter to be selected and surveyed, and including also "such lands of the United States as may have been or may hereafter be selected, and sanctioned by the general government; and such plats and maps, when so made shall be forthwith deposited by said commissioner as follows, to wit: One shall be forwarded to the Secretary of the Treasury of the United States, one to each of the offices of Secretary, Auditor and Treasurer of State, and reserve one for his own use as such commissioner." Acts 1831, *supra*.

The commissioner was required to offer for sale at Logansport, Cass county, in half-quarter sections, all the aforesaid lands, selected or to be selected, "in the Indian

country, together with all such aforesaid lands as have been or may be selected out of the United States lands, which may be sanctioned by the general government." "All the quarter sections of said lands which may be adjoining the road named and established by the act above recited, shall be sold in north-and-south halves, and all other quarter sections shall be sold in east-and-west halves." The commissioner was required to keep in a book a true and full account of each tract of land sold, the purchaser's name, etc., and to forward a true transcript of the account to each of the offices of the Auditor and Treasurer of State; and these officers were required to enter in their books all the accounts, transcripts and returns from the commissioner, who was required to deposit his books of sale, and his map by which he sold, in the office of the Secretary of State, who was required to cause to be prepared certificates for the purchasers of the lands by half-quarter sections, the numbers of the certificates to be noted on a book kept by the Secretary of State.

By an act of 1831 (Acts 1831, p. 119) it was provided that the portion of the Michigan Road lying between Logansport, Cass county, and the county seat of St. Joseph county, at or near the southern bend of the St. Joseph river, should be cut and opened sixty-six feet wide as soon as funds were obtained by and through the sale of Michigan Road lands, and finished as soon as convenient thereafter, the contract commissioner being given power to make such slight changes in the location of the road as should not increase the distance; and Noah Noble was appointed contract commissioner on said road to carry into effect the provisions of this act, and he was directed to take measures for having the whole under contract by the fourth Monday of August, 1831, provided funds should be obtained. The contract commissioner and the contractors doing the work were to be paid out of proceeds of Michigan Road lands.

By an act of February 2, 1832 (Acts 1832, p. 122), provision was made for the election by the General Assembly of a "Commissioner of the Michigan Road Lands," to hold office for two years, and until his successor was chosen and qualified. To him were transferred the powers of the contract commissioner under the previous acts; and he was directed to sell, in half-quarter sections, so much of the Michigan Road lands as would produce a sum sufficient to refund to the State the amount advanced and the amount due for contracts theretofore made, being "all the lands included in the sections through which the road passes from Logansport to Lake Michigan; the quarter sections that lie between Lake Michigan and the south bend of the St. Joseph, included in the sections above named, should be divided by a north-and-south line, and those which lie between the south bend and Logansport, by an east-and-west line: Provided, that in all cases when any half-quarter section as aforesaid, shall be divided by said road running through the same, the commissioner shall have power if he consider it for the interest of the State, to sell the part lying on one side of the road in one parcel, and attach and sell with the half-quarter that which lies on the opposite side of said road in the same section, the other part of said half-quarter, so that every part of land sold may lie on said road."

This implies discretionary power to sell the entire half-quarter section "divided by said road running through the same." By section twelve of this act it was provided that the commissioner should cause that part of the road between Logansport and Lake Michigan to be laid off in sections of one mile each, to be numbered in numerical order, one, two, three and so on, commencing at Logansport; and he was authorized to make "such alterations in said road as he may deem necessary, within the sections of land selected and surveyed for said road, and through such other lands as the road may pass; such alterations may be

made as may be deemed beneficial and lessen the expense of opening the same, and not materially increase the distance, with the consent of the owners of such lands; and the commissioner is authorized to receive relinquishments to the State, for the use of the road the width of 100 feet for said road, and said commissioner is authorized to make such alterations at Michigan City, a town lately laid off at the termination of said road on Lake Michigan, so as to enter Michigan street and pass along the same and Wabash street in said town, to the termination of said road." By section eleven the commissioner was authorized and required to have that part of the road lying between Logansport and Lake Michigan at the mouth of Trail Creek cut and opened 100 feet wide between June 15 and November 30, 1832.

Besides the various statutory provisions for the application of the funds arising from the sale of Michigan Road lands, to the locating, opening and improving of the road, the boards doing county business in the counties through which the road passed were authorized and required by an act of February 2, 1837 (Acts 1837, p. 95), to divide the road into districts, and to appoint a supervisor to each district, whose duty it should be to call out the inhabitants liable to work upon roads in their respective districts to work the road at such times and in such manner as they might deem best calculated to improve the road and keep it in repair, each man to work upon the road at least two days in each year. The supervisors so appointed and the hands so liable to work were by the act of February 13, 1841 (Acts 1841, p. 167), to be governed by and subject to all the penalties prescribed by the general statute of 1838 relating to roads and highways; and by a statute of January 31, 1842 (Acts 1842, p. 144), the boards doing county business in the several counties through which this road ran were authorized and required to place under the charge of the proper supervisors through whose dis-

tricts any portion of the road passed such portion of the
road as lay in the bounds or limits of such supervisors,
whose duty it was made to keep the same in repair in the
same manner and liable to the same penalties as were pre-
scribed by said general statute of 1838.    See, also, R.
S. 1843, p. 1041.

By §470 Burns 1901, §463 R. S. 1881, it is provided
that the register, catalogue, tract book, plat book and de-
scription of lands kept at any land office of the
4.    United States located in this State, or at any office
for the sale of canal or Michigan Road lands, and
copies thereof duly certified as true and complete by their
proper keeper, and copies duly certified by the Auditor
of State as true and complete copies from said original
documents, or from copies of the same legally deposited
in the office of said Auditor of State, shall be admissible
in evidence in civil actions in all the courts of this State,
and shall be taken and held as *prima facie* evidence of
the truth of their contents.    By §7651 Burns 1901, §5628
R. S. 1881, it is provided: "All the records pertaining to
the    *    *    *    Michigan Road lands, canal lands, govern-
ment lands, sale books, tract books, surveyors' field notes,
plat books, government patents to the State, and all original
land records in the various land districts and departments
where the lands were originally entered or sold by the gov-
ernment,    *    *    *    shall be concentrated in the office of
the Auditor of State," etc.    See, also, Acts 1844, pp.
93, 103.

The appellant introduced in evidence a certificate of
the acting commissioner of the general land office, dated
August 14, 1835, certified by the Auditor of State, in
which the acting commissioner certified that prior to the
year 1831, section thirty-one, township thirty-eight north,
range four west, comprising 635.12 acres, was selected by
the commissioners appointed under a law of the State of
Indiana to select the lands granted by the treaty of 1826

and the act of congress of March 2, 1827, above, mentioned, and which were not sold by the United States prior to the passage of the act of congress of March 2, 1831, entitled "An act confirming the selection heretofore made of lands for the construction of the Michigan Road, in the State of Indiana," 4 Stat. at Large, p. 473.

We know that the section designated in this certificate is in the southwest corner of the township designated, while the land here in question, in section twenty-eight of the same township, is the third section eastward from the western boundary of the township and in the second tier of sections from the southern boundary of the township.

We also know that both of these sections and the city of Michigan City.are situated on the southeastern portion of Lake Michigan, far within or northward from the ten-mile line running eastward from the southern extreme of Lake Michigan, and therefore within and part of the territory ceded to the United States by the first article of the treaty. By the same article the Pottawatomies ceded their right to all the land through which, by the state statutes, it was directed that the Michigan Road should be surveyed and opened, for a considerable distance north of Logansport and the Wabash river. They had previously, in 1818, ceded to the United States all their claim in the country south of the Wabash river. See Senate Document (Vol. 35) No. 452, Indian Affairs, Laws and Treaties (Vol. 2), p. 117; 7 Stat. at Large (Indian Treaties), p. 185.

The statement in *Hamilton* v. *State* (1886), 106 Ind. 361, cited by the appellant, that by this treaty of 1826 the Indians ceded to the United States "a strip of land 100 feet wide, commencing at Lake Michigan and extending by way of Indianapolis to the Ohio river," etc., is not wholly accurate, though the inaccuracy does not affect the decision. There is nothing in that case indicating an

opinion that the adjoining proprietors had not title to the soil to the middle line of the road. The right of the Pottawatomies to the lands on Lake Michigan westward. of those ceded by the treaty of 1826, and to the lands intervening between the northern and the southern lands ceded by that treaty, was ceded to the United States by subsequent treaties, in one of which, made October 26, 1832, a portion of the Michigan Road was designated as one of the boundary lines. Senate Document, *supra,* p. 268; 7 Stat. at Large (Indian Treaties), p. 394. The appellant attempted to prove by oral evidence that the *locus in quo* was by reputation the Michigan Road contemplated by the treaty and statutes. Whether the existence of the particular highway so named and so running between particular, widely separated termini may be so proved, and whether, if so provable, the testimony of the witnesses introduced went to the extent intended, we will not examine or decide; for the determination of such questions in the affirmative would not settle in favor of the appellant the further one whether the ownership of the fee was in the adjoining proprietor.

The contention on behalf of the appellant assumes that there was ceded by the Indians to the general government, and by it transferred to the State of Indiana, a strip of land 100 feet in width from the shore of Lake Michigan to the Wabash river, the title to which strip of land in fee simple still is held by the State.

For the lands ceded by the first article of the treaty of 1826 a consideration by way of a promised annuity and of goods furnished was provided in articles three and four, and the second article containing the cessions for the road expressed therefor a separate consideration; but assuming that the United States and the State of Indiana became bound to construct such a road from Lake Michigan to the Ohio river with the proceeds of the sections of land provided for such purpose, there was an obligation upon

the grantees to provide, out of the territory ceded, the necessary strip of land for the location of the road through that territory, and also to procure the necessary land for the location of the road 100 feet in width from the Wabash river to the Ohio river; and there was also an obligation on the part of the Pottawatomies to permit the location of the road of the same width through the intermediate territory not ceded by them, if when it was located and opened they still retained such territory; and if at the time of such location and opening such intermediate territory had passed by cession to the United States or the State of Indiana, such obligation to provide the necessary land for the road would be imposed upon the United States or the State.

By a joint resolution of the General Assembly, January 29, 1831 (Acts 1831, p. 189), the cause of the second survey and relocation of the road is indicated to have been the impracticability of making the road as first surveyed through the Kankakee swamps; and it was said: "Inasmuch as the location of said road, as above ceded and authorized, would necessarily be made through the lands purchased by said treaty, by the United States, of said Pottawatomie tribe, and especially through the ten-mile purchase, named in the latter clause of the first article thereof, the southern line of which would otherwise entirely exclude the road from Lake Michigan, this General Assembly feel constrained to assert, as their right, the privilege of locating and making said road, on the most suitable and practical route, from Lake Michigan, by way of Indianapolis, to the Ohio river, and of applying 100 feet wide of land, on which to locate the same, as well as one section of contiguous land, for the construction of the road, selecting the same, as from the location of said road, this State would be fully entitled to, from the lands so being on the route, and lying contiguous thereto, whether the same should have remained as the property

of said tribe of Indians after said treaty, or were, by the provisions thereof, ceded to the United States," etc. Notice was directed to the fact that some of the lands on the new route had been sold by the general government, and claim was made to the general government for lands which had been selected on the new route by the State's commissioners, and the payment to the State of the proceeds of those sold by the general government. Accordingly, by an act of congress of March 2, 1831 (4 Stat. at Large, p. 473), the selections and locations theretofore made by this State of the Michigan Road lands, so far as they might remain unsold, were sanctioned and confirmed; and it was provided that other public lands in Indiana, in lieu of those already sold, should be selected under the same authority under which the original locations were made, etc.

There is no evidence of any grant from the United States to the State of any strip of land 100 feet wide, in any locality, except the turning over of the cession made in the second article of the treaty to the State by the acts of congress to which we have referred. In designating the manner in which the lands donated by the treaty and the act of congress to open the road should be selected and surveyed by the commissioners appointed by the General Assembly, if the general government should refuse to survey them, the commissioners were directed by the act of 1830 to proceed to select and survey the land "into sections, in the manner and form that the lands of the United States are surveyed and laid off." The only section of the selection of which the appellant has been able to furnish evidence was a section designated as in a regular congressional survey, which is situated more than two miles southwestward from the *locus in quo*. If the road was located in that section by the survey authorized in 1828, and adopted in 1830, and mentioned in the joint resolution of 1831, such location was changed, possibly

pursuant to the authority in the act of February 2, 1832, to make alteration at Michigan City, a town then lately laid off at the termination of the road on Lake Michigan, so as to enter Michigan street and pass along the same and Wabash street in said town. The *locus in quo* is a part of Michigan street within the corporate limits of Michigan City, but when it was included therein is not shown by the evidence. The statutes to which we have referred provided for discretionary alterations within the sections of land selected and surveyed for the road and through other lands with the consent of the owners, and in the portion between Logansport and the lake the commissioner was authorized to receive relinquishments to the State "for the use of the road the width of 100 feet for said road;" and in locating the road between Madison and Greensburgh, the commissioners were required to take releases of damages of the persons through whose land the road ran. Provision was made for the sale of the selected lands through which the road ran by half-quarter sections, no provision being made for special exception of the strip on which the road ran; and there is no evidence before us that any such special exception of that strip was made in any patent or any deed of conveyance.

The appellant seeks to have declared, with reference to this particular road, a distinction, which, if allowed, would be contradictory of the presumption of the common law relative to the soil of highways.

By the law of Rome and of those states in which the principles of the civil law have obtained, the soil of a public road, a highway, is declared to be public property. The doctrine seems to have had support upon 8. the reason that such roads were made by the direct action of the supreme government, on the public domain, at the cost of the public treasury. See the arguments of counsel in *Wetmore* v. *Story* (1856), 22 Barb. 414, 433, and in *Renthorp* v. *Bourg* (1816), 4 Martin (La.) *97.

Where the land of a highway belonged to the government, and not to the owners of the adjacent lands, a deed bounding the lands upon such highway was held to carry only to the roadside. *Dunham* v. *Williams* (1867), 37 N. Y. 251. That case applied the rule of the civil law, which prevailed in the Dutch colony, to the case of an ancient highway.

In *Hines* v. *Kingston Coal Co.* (1898), 186 Pa. St. 43, 40 Atl. 151, it was held that, where the state grants lands to abut on a public highway, the title of the grantee extends to the middle of the highway, as in case of ordinary private grants.

In *City of Dubuque* v. *Maloney* (1859), 9 Iowa 450, 74 Am. Dec. 358, the government of the United States having laid out the town of Dubuque, and a person having become a purchaser of a lot adjoining one of the streets, and having received a patent from the United States therefor, it was held that he, and not the city, took the legal title to the soil to the center of the street, subject to the public easement. The court, in support of its holding, quoted the following from 3 Kent's Comm., *433: "The established inference of law is, that a conveyance of land bounded on a public highway carries with it the fee to the center of the road, as part and parcel of the grant. The idea of an intention in a grantor to withhold his interest in a road to the middle of it, after parting with all his right and title in the adjoining land, is never to be presumed. It would be contrary to the universal practice." See *Cox* v. *Louisville, etc., R. Co.* (1874), 48 Ind. 178, 188.

In *Terre Haute, etc., R. Co.* v. *Scott* (1881), 74 Ind. 29, certain lots in question were part of a tract of land donated by the United States to the State of Indiana as a site for a permanent seat of government for the State. The town of Indianapolis was laid out by the State, and included said lots, abutting on Kentucky avenue, within

said tract. The lots were sold and conveyed by the State through its proper agents to one White, from whom a party to the action derived title. It was said by the court: "In laying out the town of Indianapolis, making and filing maps as required by law, the State vested in the town for the use of the public such rights to, and interest in, the streets and alleys of the town as would have vested in it had any citizen been the proprietor and laid out the town in the same way. And the deed to White gave him just such rights to, and interest in, the streets upon which the lots conveyed abutted, as would a like deed made by any other party who might have been the proprietor of the town."

An examination of the statutes enacted contemporaneously with those relating to the Michigan Road will disclose that much of the legislation of that period 10. related to the location, opening and improvement of public roads, and that by statutes too numerous for special citation it was the constant practice to cause the location and opening and improvement of what were called state roads by commissioners appointed by the General Assembly, and to provide for the payment of the expenses pertaining thereto through appropriations made by the General Assembly from the state treasury.

Whatever may be said of the decisions of our courts relating to the rights of owners of land abutting upon the canals of this State, those decisions proceed upon constructions placed upon the statutes relating to canals; and in the case before us we have to consider other statutes.

The road here in question was surveyed, opened and established upon lands, the title to a portion of which was recognized as belonging to the Indians, while the title to other portions was in the United States or the State of Indiana, and the title to other lands was in individual proprietors, and some portions of the road were upon previously established public roads. Where it was

established upon private lands it is to be presumed that consent was obtained or there was acquiescence.

We find no occasion for supposing that it was not from the beginning intended that the road should have, when opened and constructed, the character of other state roads as to the ownership of the soil of the way. It seems to have always been considered and intended that the cession of the strip 100 feet wide for a road was a cession of a public easement, through portions of sections of land as surveyed by the United States, or by the State in the usual and established manner in which the surveys of the general government were made.

There can be no dispute concerning the portion of the road between Madison and Indianapolis, and there is no indication of an intent of the legislature that the State should have a greater interest in one portion of the road than in another. As to those portions in the northern part of the State where the road was opened through lands already granted by the United States to private owners, with or without their express consent, there is no indication that a greater interest than a public easement was appropriated; and where the State owned both the road and the abutting lands, and conveyed the latter to individual purchasers, they, upon the principles of the common law recognized generally in England and the United States, would take the fee to the middle line of the road.

The appellant, instead of introducing available evidence of the original circumstances as matters of fact, has seen fit to insist earnestly and with apparent seriousness that we should take notice judicially that the State is the owner in fee of the *locus in quo* because of its being, as claimed, a part of the Michigan Road; and because of this serious insistence we have taken considerable space—perhaps more than necessary—in the examination of the matter so proposed.

Judgment affirmed.